# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DORY L.,

      Plaintiff,

        v.

FRANK BISIGNANO,
  COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

No. 24 CV 50224

Magistrate Judge McShain

## MEMORANDUM OPINION AND ORDER

Plaintiff Dory L. appeals the Commissioner of Social Security's decision denying her application for benefits. For the following reasons, plaintiff's motion for summary judgment is denied [13], defendant's motion for summary judgment [18] is granted, and the denial of benefits is affirmed.[1]

## Background

In 2015, plaintiff applied for a period of disability and disability insurance benefits, alleging an onset date of October 1, 2003. [11-1] 35. The claim was denied initially, on reconsideration, and by an administrative law judge in March 2018. [*Id.*]. The Appeals Council denied review, plaintiff appealed to this Court, and this Court vacated the denial of benefits and remanded. [*Id.*] 1-6, 884-98; *see also Dory L. v. Saul*, Case No. 19 CV 50106, 2020 WL 5763612 (N.D. Ill. Sept. 28, 2020). On remand, the ALJ again denied plaintiff's claim. [11-2] 793-806. Plaintiff then appealed to this Court, and the parties agreed to remand the case for further administrative proceedings. [11-4] 1766. On remand, the ALJ denied plaintiff's claim. [*Id.*] 1694-1707. The Appeals Council denied further review [*id.*] 1671-74, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955 & 404.981. Plaintiff has again appealed to this Court, and the Court has subject-matter jurisdiction pursuant to 42 U.S.C. § 405(g).[2]

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [11], which refer to the page numbers in the bottom right corner of each page.

[2] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge [7].

The ALJ reviewed plaintiff's claim in accordance with the Social Security Administration's five-step evaluation process. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date through December 31, 2008, her date last insured (DLI). [11-4] 1697. At step two, the ALJ determined that plaintiff had the following severe impairments: Huntington's disease, major depressive disorder, and obesity. [*Id.*]. At step three, the ALJ concluded that plaintiff's impairments did not meet or equal the severity of a listed impairment. [*Id.*] 1697-99. Before turning to step four, the ALJ ruled that plaintiff had the residual functional capacity to perform light work, except that plaintiff could (1) frequently reach bilaterally with the upper extremities or push/pull with all extremities; (2) occasionally balance, stoop, kneel, crouch, or crawl; (3) never climb ladders, ropes, or scaffolds; work at unprotected heights; or work with moving machinery; (4) perform only simple, routine tasks; and (5) interact frequently with supervisors, interact occasionally with coworkers, and have only brief and incidental interaction with the general public. [*Id.*] 1699-1705. At step four, the ALJ found that plaintiff could not perform her past relevant work. [*Id.*] 1705. At step five, the ALJ held that jobs existed in significant numbers in the national economy that plaintiff could perform: packer (10,000 jobs), assembler (6,000 jobs), laundry folder (5,000 jobs), and garment sorter (4,000 jobs). [*Id.*] 1705-07. The ALJ accordingly found that plaintiff was not disabled.

## Legal Standard

The Court reviews the ALJ's decision to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing a disability decision for substantial evidence, we will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Warnell v. O'Malley*, 97 F.4th 1050, 1052-53 (7th Cir. 2024) (internal quotation marks and brackets omitted).

## Discussion

## I.     Step Five Ruling

Plaintiff raises five challenges to the ALJ's ruling at step five that jobs existed in significant numbers in the national economy that she could perform. [13] 5-17, 18-20. The Court addresses each in turn.

2

### A.  Number of Jobs

"At step five, the ALJ is granted discretion to determine what constitutes a 'significant' number of jobs on a case-by-case basis." *Milhem v. Kijakazi*, 52 F.4th 688, 694 (7th Cir. 2022). Case law "does not provide a clear baseline for how many jobs are needed" to constitute a "significant" number. *Id.* "The only guideposts are that: work existing in very limited numbers cannot meet the requirement; 140,000 national jobs is well above the threshold for significance, and 89,000 national jobs is in accord with the numbers of national jobs held to be significant by other circuits." *Nilda G. v. O'Malley*, No. 22 C 1542, 2024 WL 4647855, at *4 (N.D. Ill. Oct. 31, 2024) (internal quotation marks omitted).

Plaintiff argues that, as a matter of law, 25,000 jobs in the national economy cannot be a "significant number" of jobs. Plaintiff contends that "[m]any courts have found that the 25,000 national jobs at issue here may not be a significant number[.]" [13] 5. The Commissioner responds that whether 25,000 jobs nationally constituted a significant number of jobs "was an issue properly left to the ALJ, and no law barred him from designating 25,000 as significant." [18] 8.

The Court agrees with the Commissioner. First, 25,000 national jobs accords with the range of job numbers identified as significant by the Seventh Circuit in *Milhem*. *See* 52 F.4th at 697 (citing with approval Ninth Circuit case holding that 25,000 national jobs was a significant number). Second, it accords with district court decisions within the Seventh Circuit finding that fewer than 25,000 national jobs can be significant. *See Stephen B. v. Bisignano*, Case No. 24-CV-1647, 2025 WL 3748306, at *10 (E.D. Wis. Dec. 23, 2025) ("While 24,000 jobs nationally does indeed seem low, given the court of appeals' more recent guidance in *Milhem*, I cannot say it is insignificant at step five."); *Nilda G.*, 2024 WL 4647855, at *4 (17,000 national jobs was significant); *Leon A. v. Kijakazi*, No. 20-cv-939, 2022 WL 3226822, at *6 (N.D. Ill. Aug. 10, 2022) (20,402 jobs was significant).

### B.  Obsolete Jobs

Plaintiff also argues that each of the jobs identified by the vocational expert (VE) and relied on by the ALJ was obsolete. [13] 6-8. In support, plaintiff contends that the Dictionary of Occupational Titles (DOT), which lists the four jobs at issue and was used by the VE, is outdated, and that "the most current manual of job descriptions" is the "O*NET," or Occupational Informational Network. [*Id.*] 7. Plaintiff argues that the O*NET does not describe jobs comparable to the garment sorter or laundry folder positions. [*Id.*] 7-8.

The Court holds that plaintiff forfeited this argument by failing to raise it during the administrative hearing. "[A] claimant who does not object to a VE's testimony during the administrative hearing forfeits those objections." *Fetting v.*

3

*Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023). "This objection must be specific; to avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology." *Id.* Because plaintiff, who was represented by counsel, did not object–or even vaguely suggest–that the jobs identified by the VE were obsolete, *see* [11-4] 1729-33 (plaintiff's counsel's cross-examination of VE), that argument is forfeited. *See Aisha M. v. Bisignano*, No. 25 C 7338, 2026 WL 915438, at *5 (N.D. Ill. Apr. 3, 2026) (plaintiff's argument that "these jobs are obsolete" was forfeited because "plaintiff, who was represented by counsel, did not object to the VE's testimony or question the VE during the administrative hearing").

Forfeiture aside, the claim lacks merit. First, while plaintiff may believe that the four positions relied on by the ALJ are obsolete, the Social Security Administration has not made such a determination–though the agency has determined that other positions described in the DOT are obsolete. *See* Emergency Message 24027 REV.[3] Second, applicable regulations permitted the ALJ to rely on the DOT. *See* 20 C.F.R. § 404.1566(d). Third, in response to a question from plaintiff's counsel about his methodology, the VE testified that he arrived at his jobs numbers by, in part, using his "experience and training in order to determine whether or not these are realistic types of positions and whether or not they truly exist within our national economy[.]" [11-4] 1730. This part of the VE's testimony–ignored by plaintiff–provides substantial evidentiary support for a conclusion that the jobs at issue are not obsolete.

## C.    VE's Reliance on SkillTRAN

Next, plaintiff argues that the VE's reliance on the SkillTRAN program to generate his job numbers was deficient. [13] 8-15. Here plaintiff contends that (1) the VE's explanation of how he used SkillTRAN was inadequate, (2) the VE should have provided the calculations he obtained while using SkillTRAN, (3) the VE failed to explain "how he reduced the total number of jobs available in an occupation group by some percentage of job titles in that group that had a similar SVP level, physical demand level, and job tasks as the DOT provided," and (4) the VE impermissibly relied on the equal-distribution method to match the broader job numbers in the Standard Occupational Classification (SOC) categories to the specific job numbers associated with the DOT codes at issue. [*Id.*].

### 1.    Forfeiture

The Court agrees with the Commissioner that plaintiff forfeited all these arguments by failing to object to the VE's testimony or otherwise suggest that his reliance on SkillTRAN made his testimony unreliable. Again, "a claimant must object to the VE's testimony or otherwise indicate that the testimony is unreliable during the administrative hearing (or after, in a post-hearing brief) to preserve his

---

[3] Available at https://secure.ssa.gov/apps10/reference.nsf/links/01062025092030AM.

objection." *Leisgang v. Kijakazi*, 72 F.4th 216, 219-20 (7th Cir. 2023). The claimant's objections "must also be specific enough to indicate that the claimant believed the methodology was unreliable." *Id.* (internal quotation marks and brackets omitted). "What all this means as a practical matter is that the ALJ is better suited than [a federal court] to unpack and untangle objections and concerns regarding the VE's methodology in the first instance. And the ALJ is best positioned to do so when the claimant identifies those objections and concerns expressly, allowing the proper development of the evidentiary record in real time." *Id.* at 220. Thus, "a claimant may not start objecting to unquestioned and uncontradicted VE testimony in federal court after the closure of the administrative record." *Id.*

Here, plaintiff did not object to the VE's reliance on SkillTRAN, and the questions she posed to the VE about his methodology were insufficient to alert the ALJ that plaintiff believed that his methodology was unreliable.

Plaintiff first asked the VE what "the source of your numbers" was, and the VE responded that he "utilized my 32-plus years' professional experience as well as my education, my training as well as information from the United States Department of Labor and SkillTRAN and OccuBrowse Pro which utilizes the statistics as well as the OES[.]" [11-4] 1730. Plaintiff then asked if the jobs numbers that the VE testified to were "for the particular DOT codes that you gave or the broader SOC groups." [*Id.*]. The VE confirmed that the numbers related to "the DOT codes," which explained why there were such "small numbers" of available jobs. [*Id.*]. In response to the question how the VE "got those numbers for the particular DOT code broken down from the broader SOC, OES groups," the VE explained:

> I plug in the hypothetical question into SkillTRAN in order to take a look at the DOT codes that are listed there and the jobs that are listed, then utilize my experience and training in order to determine whether or not these are realistic types of positions and whether or not they truly exist within our national economy as there are a list of other types of occupations that I have not seen and heard of like a – you know, there are some inspecting positions out there that I don't believe that truly exist. There are different types of assembly positions and I just want to make sure that these types of jobs that I give I'm aware of and I've seen.

[*Id.*] 1730-31.

Plaintiff then asked if the VE knew what "methodologies" SkillTRAN "uses to . . . get those numbers," and the VE responded that SkillTRAN "indicate[s] that their number are not exact," "they even indicate that there is a considerable amount of confusion," and that SkillTRAN's numbers represent "only a general estimate." [11-4] 1731. Plaintiff asked the VE whether SkillTRAN uses the equal distribution method and how it "differentiate[d] between the skill and exertional levels," and the

VE responded at length that, by "plugging in the different levels of physical tolerances that are given to you" and taking into account "all these factors," he was "able to break down those numbers" and provide jobs numbers to the ALJ. [*Id.*] 1731-32. Plaintiff then concluded her examination of the VE without raising any objection to his testimony or asking the ALJ to hold the record open so that she could submit a post-hearing brief.

In the Court's view, plaintiff's questions about the VE's methodology were insufficiently specific to alert the ALJ that plaintiff was taking issue with the VE's overall methodology or his use of the SkillTRAN program. Was plaintiff objecting to the use of SkillTRAN in general, the VE's claimed use of the equal-distribution method, the way the VE derived the smaller number of DOT jobs from the broader category of SOC positions, or some other component of his testimony? The Court does not know because even though plaintiff explored these areas with the VE, she did not follow up with any specific objections or argument that some or all the VE's methodology was unreliable. For all the Court knows, plaintiff may have been satisfied with the VE's answers and thus decided that no objection was warranted. Accordingly, the Court finds that plaintiff's arguments are forfeited for failure to make a specific objection during the hearing or in a post-hearing brief. *See Fetting*, 62 F.4th at 338 (holding that objections to VE's testimony were forfeited where "Fetting's attorney asked the VE four questions regarding the VE's methodology but did not otherwise indicate that he believed the methodology was unreliable").

Finally, the Court rejects plaintiff's argument that her pre-hearing brief, *see* [11-4] 1944-48, constitutes a timely and specific objection to the VE's testimony. *See Schmitz v. Colvin*, 124 F.4th 1029, 1033 (7th Cir. 2024) (claimant must make "timely objection to the sufficiency of a vocational expert's testimony"). By definition, the pre-hearing brief could not have been a specific objection because the VE had not yet testified, and neither plaintiff nor the ALJ could have known what the substance of that testimony would be, on what grounds, if any, it could be challenged, and whether there was a need to resolve the objections raised in the pre-hearing brief. Indeed, the ALJ advised plaintiff that her pre-hearing objections were "premature" because "[t]he vocational expert has not, in this pre-hearing procedural posture, been asked to provide any specific information on job numbers or job titles" and advised plaintiff that such objections "may be renewed during the hearing." [11-4] 1903.

### 2.     Facially Implausible or Incoherent Testimony

The Court further concludes that the VE's testimony was not so "facially implausible or incoherent" that the ALJ could not rely on it despite plaintiff's failure to object to it. *Leisgang*, 72 F.4th at 220.

Because the SSA "bears the burden at step five to show that there exist substantial numbers of jobs in the national economy that the claimant can actually

do," and because "[a] claimant cannot waive the substantial evidence standard," the ALJ "retains the duty in all cases to hold the VE to account for the reliability of his jobs-number estimates." *Schmitz*, 124 F.4th at 1033 (internal quotation marks omitted). Accordingly, "even in the absence of an objection, the ALJ still cannot accept testimony from a VE that is facially implausible or incoherent." *Id.* (internal quotation marks omitted). "But assuming that there are no obvious flaws in the testimony, where a claimant has failed to put the vocational expert's methodology into issue and the expert's testimony is otherwise uncontradicted, the ALJ is entitled to credit that testimony." *Id.*

The VE's testimony here was not so implausible or incoherent that the ALJ's reliance on it was reversible error. As seen above, the VE (1) relied on his training and more than three decades of experience, (2) used the SkillTRAN program, a source of jobs data that is "well-accepted in the field," *Nilda G.*, 2024 WL 4647855, at *3 (internal quotation marks omitted); and (3) confirmed that his testimony was consistent with the DOT, *see* [11-4] 1724, 1727. The VE also testified that he arrived at his jobs numbers by, in part, considering "whether or not these are realistic types of positions and whether or not they truly exist within our national economy." [*Id.*] 1730-31. The VE here was "a well-credentialed witness with more than [30] years' experience" in the field, and his "testimony was coherent and plausible." *Schmitz*, 124 F.4th at 1034. While the VE did not provide the detailed, granulated description of how the SkillTRAN program's algorithm works that plaintiff belatedly insists he was required to provide, "[t]he inability of the vocational expert to precisely explain the software's algorithms does not render his explanation unreliable." *Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, at *3 (7th Cir. Aug. 1, 2023).

## D.    Failure to Rule on and Enforce Subpoena

Plaintiff contends that the ALJ erred by failing to rule on and enforce her subpoena for certain materials maintained by the VE. [13] 18-20. The argument has no merit.

Before the hearing, plaintiff submitted a "Pre-Hearing Memorandum and Subpoena Duces Tecum Request." [11-4] 1940. Plaintiff asked the ALJ to order the VE to "have and bring with them all materials they will be relying upon for their potential Step 5 testimony, including any third-party software based job estimation programs." [*Id.*] 1946. The ALJ denied this request for multiple reasons. First, the ALJ found that the subpoena request was premature because the VE "would have no knowledge in advance of the hearing of the questions that may be asked" and "would not know what documents, if any, s/he might use or rely on at the hearing." [*Id.*] 1902. Second, the ALJ concluded that the request was overbroad because it sought documents that would encompass the VE's work product. [*Id.*]. Third, the ALJ determined that the request did not comply with multiple provisions of the SSA's Hearings, Appeals, and Litigation Law Manual (HALLEX), including a rule requiring

the claimant to state why the important facts could not be proved without a subpoena. [*Id.*] 1902. Finally, and notwithstanding plaintiff's failure to comply with HALLEX, the ALJ "independently considered" whether the requested materials were "reasonably necessary for the full presentation of the case" concluded that they were not, given that the VE would be available for cross-examination. [*Id.*]. Plaintiff did not renew her subpoena request at the hearing or in a post-hearing brief.

"[A]n ALJ's decision whether to grant a pre-hearing subpoena request is reviewed for an abuse of discretion." *Jackie A.C. v. Bisignano*, Case No. 1:24-cv-1485-MMM-RLH, 2025 WL 4052507, at *11 (C.D. Ill. Dec. 3, 2025). There is no categorical requirement that a VE produce the data supporting his testimony. *See Biestek*, 587 U.S. at 108. "The Seventh Circuit has explained that, although it would be *helpful* to have the expert's underlying sources at a hearing, the denial of a subpoena request is reversible error only [i]f the claimant shows that the subpoena was *necessary*." *Jackie A.C.*, 2025 WL 4052507, at *11 (internal quotation marks omitted; emphasis in original).

Here, the ALJ did not abuse his discretion by declining to issue the subpoena. At the outset, the Court notes that, contrary to plaintiff's representation, the ALJ did rule on the request for a subpoena. [11-4] 1901-04. Moreover, the ALJ reasonably concluded that plaintiff had not demonstrated that a cross-examination of the VE would be insufficient to understand how the VE arrived at his jobs numbers and expose flaws in his methodology. *See Duana J. v. Bisignano*, Case No. 24-cv-50088, 2025 WL 2209751, at *3 (N.D. Ill. Aug. 4, 2025) (affirming denial of subpoena where pre-hearing request did not "establish why questioning the VE about his methodology would be insufficient"). Plaintiff's pre-hearing request asserted only that "a vocational expert's testimony would be more reliable and probative if supporting data was produced" and that ALJs must undertake "an inquiry into the reliability of the VE's testimony" rather than unquestioningly accept "the VE's say-so." [11-4] 1946. But these arguments suggest only that it would have been helpful to have the VE's underlying data, not that it was *necessary* for plaintiff to prosecute her case. Plaintiff's failure to demonstrate why the subpoena was necessary here is especially glaring, given that she failed to use her cross-examination to explore with the VE any of the multiple issues she raises for the first time in this Court.

## E.  Due Process Violations

Finally, plaintiff argues that she was deprived of due process because (1) the ALJ "enforced the substantial evidence standard much more arbitrarily and harshly at Step 3 than at Step 5," (2) there is no evidence "supporting the VE's Step 5 SkillTRAN estimates," (3) she was not given the chance to show that the VE's testimony was untrue, and (4) the ALJ ignored her "post-hearing rebuttal and challenges" to the VE's testimony. [13] 15-16.

This Court agrees with the decision in *Leo S. v. Bisignano*, where Magistrate Judge Schneider concluded that an identical argument was "ambiguous and difficult to understand, or at the very least, repetitive of Plaintiff's previous argument[s]." Case No. 25-cv-50153, 2026 WL 74157, at *4 (N.D. Ill. Jan. 9, 2026). As in that case, here plaintiff "provides no support" for her claim that the ALJ more strictly applied the substantial-evidence standard at step 3–where the ALJ found, in a ruling that plaintiff does not challenge, that plaintiff did not meet a listing–than at step 5. As the Commissioner notes, moreover, the ALJ's use of the phrase "not entirely consistent" when evaluating whether plaintiff's subjective allegations were consistent with the record does not mean the ALJ applied the wrong standard (or applied the correct standard too harshly). *See Cori Ann G. v. O'Malley*, No. 20 C 3402, 2024 WL 689976, at *8 (N.D. Ill. Feb. 20, 2024) ("the Seventh Circuit has made it clear that the 'not entirely consistent' language is not a remandable offense" and concluding that "an argument like this does nothing to move the needle toward a remand and really serves only to bog down review").

To the extent plaintiff bases her due process claim on the VE's testimony and his reliance on SkillTRAN, the Court rejects it for the reasons given in Section I.C.2., *supra*. The Court also notes that plaintiff's claim that she did not have the chance to show that the VE's jobs-numbers testimony is not true: plaintiff had the unfettered ability to cross-examine the VE, but she failed to use her cross-examination to explore any of the myriad arguments that are raised in her opening brief. Finally, plaintiff's claim that she made "post-hearing rebuttal and challenges" to the VE is likewise untrue. Plaintiff cites no part of the record to support this representation, and there is no post-hearing brief in the record. To be sure, plaintiff raised some of her current claims respecting the VE in her brief to the Appeals Council, but this was too little, too late. *See Leisgang*, 72 F.4th at 219-20; *Fetting*, 62 F.4th at 338.

\* \* \*

For these reasons, the Court rejects plaintiff's challenges to the ALJ's step five ruling.

## II. Interactions with General Public

Plaintiff argues that the ALJ erred by determining that she could tolerate brief, incidental interactions with the general public. [13] 17-18. In support, plaintiff notes that the ALJ gave significant weight to the opinion of Dr. Buechner, a medical expert who testified during the December 2021 hearing, but did not explain why or whether she was rejecting Buechner's opinion that plaintiff "should have no public facing position[.]" *Id.*; *see also* [11-4] 1703-04.

The Court concludes that any error in the ALJ's handling of Dr. Buechner's opinion was harmless. In Social Security disability appeals, "[a]n error is harmless if, upon examination of the record, the court can predict with great confidence what the

result of remand will be." *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022). Here, the VE testified that none of the jobs he identified entailed contact with the general public. *See* [11-4] 1727 ("As you'll note the fifth digit of the DOT codes that I gave was an eight which would indicate that there is no contact with the general public[.]"); *see also* [*id.*] 1706 (DOT codes listed in ALJ's decision). Accordingly, even if the ALJ should have credited and incorporated Dr. Buechner's no-public-facing-position restriction in the RFC, the ALJ's failure to do so was harmless because neither the packer, assembler, laundry folder, nor garment sorter position required plaintiff to interact with the public.

### III.    Subjective Symptom Determination

Finally, plaintiff contends that the ALJ erred in evaluating her subjective symptom allegations. [13] 20-21. Plaintiff claims that the ALJ did not cite any evidence in the record that was inconsistent with her allegations and recognized that her ability to perform activities of daily living (ADLs) was minimal and she was unable to meaningfully interact with the public. [*Id.*] 20. Plaintiff also argues that the ALJ discussed certain treatment notes without recognizing that they were consistent with the severity of her alleged symptoms. [*Id.*] 21.

"When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations." *Alejandro D. v. O'Malley*, No. 21 CV 5250, 2024 WL 4465475, at *5 (N.D. Ill. Oct. 10, 2024) (internal quotation marks omitted). "The ALJ must explain her subjective symptom evaluation in such a way that allows the Court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Id.* (internal quotation marks and brackets omitted). "The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is patently wrong." *Id.* (internal quotation marks omitted). "Flaws in the ALJ's reasoning are not enough to undermine the ALJ's decision that a claimant was exaggerating her symptoms. Not all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (emphasis in original; internal quotation marks and brackets omitted). The Seventh Circuit has even stated that it "would not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding." *Schrank v. Saul*, 843 F. App'x 786, 789 (7th Cir. 2021).

The Court concludes that the ALJ's subjective symptom determination was not patently erroneous.

First, the ALJ discussed multiple parts of the record that were inconsistent with plaintiff's claims of disabling limitations. Perhaps most importantly, the ALJ noted that the medical evidence from prior to plaintiff's DLI did not reflect complaints

of tics and involuntary muscle movements that were associated with her Huntington's disease and that became much more pronounced after the DLI. *See* [11-4] 1700-01; *see also* [11-1] 365-70. As the ALJ also noted, the evidence from the early period postdating plaintiff's DLI, which might have supported an inference that plaintiff was disabled during the alleged disability period, also failed to reflect significant functional limitations. *See* [11-4] 1700 (noting plaintiff's statement in June 2009 that she never sought medical care for abnormal movements because "it did not really interfere with anything"). Finally, the ALJ noted that, in early 2009, plaintiff's symptoms "initially improved and stabilized for a time" while plaintiff was taking Xanax. [*Id.*]; *see also Alejandro D.*, 2024 WL 4465475, at *5 ("the ALJ was entitled to consider whether plaintiff's condition had responded to or improved with treatment"). The ALJ therefore permissibly concluded that plaintiff's allegations were "inconsistent with a reasonable extrapolation back to the relevant period based upon the longitudinal medical records." [11-4] 1700.

Second, the ALJ recognized that plaintiff reported that her ADLs were limited by her severe impairments, but he concluded that this factor was "outweighed by the other factors in this decision." [11-4] 1700. Plaintiff does not acknowledge this ruling, let alone demonstrate that it was patently erroneous.

Third, as plaintiff notes, the ALJ discussed a treatment note from her September 10, 2009, visit with a neurologist where plaintiff reported that her involuntary shoulder movements had not previously bothered her. [13] 21; [11-4] 1700. This note also reflects plaintiff's report that "since she has had the abnormal movements and a great deal of fatigue, she has not been going for her walks as she has in the past." [11-4] 656. The ALJ did not explicitly discuss this portion of the September 2009 note, but an ALJ "need not address every piece or category of evidence" in the record. *Warnell*, 97 F.4th at 1053. Furthermore, the ALJ did not ignore an entire line of evidence: he discussed multiple pieces of evidence that, like this treatment note, tended to show that plaintiff's symptoms worsened after her DLI, and that discussion was consistent with his conclusion that plaintiff "started reporting symptoms less than a year after the date last insured." [11-4] 1700.

Finally, there is no merit to plaintiff's argument that the ALJ's subjective symptom determination is flawed because the ALJ supposedly ignored evidence that plaintiff had a limited ability to interact with the general public. As discussed in Section II., *supra*, all the jobs that the VE identified and that the ALJ relied on at step five entailed no interactions with the general public. Accordingly, even assuming, *arguendo*, that the ALJ did not fully credit, but should have fully credited, plaintiff's allegations about her ability to interact with the general public, that error was harmless because none of the jobs at issue required her to have any interactions with the general public. *See Wilder*, 22 F.4th at 654.

11

For these reasons, the Court rejects plaintiff's argument that the ALJ erred in evaluating her subjective symptoms.

## Conclusion

Plaintiff's motion for summary judgment is denied [13], defendant's motion for summary judgment [18] is granted, and the denial of benefits is affirmed.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: June 22, 2026**

12